UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 20-34-DLB-EBA

ANGELA McNUTT                                                                 PLAINTIFF


v.                          <u>MEMORANDUM OPINION AND ORDER</u>


ROSS EDUCATION, LLC                                                      DEFENDANT

* * * * * * * * * * * * * * *

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment in this sex discrimination, disability discrimination, and Family Medical Leave Act ("FMLA") retaliation case (Doc. # 33).  The Motion has been fully briefed (Docs. # 54 and 59), and is now ripe for the Court's review.  Also before the Court is Defendant's Motion for Leave to File Excess Pages (Doc. # 32) and Plaintiff's Motion for Leave to File Excess Pages (Doc. # 53), which are both ripe (Docs. # 55 and 58).  For the reasons set forth herein, Defendant's Motion for Summary Judgment (Doc. # 33) is **granted in part and denied in part**, Defendant's Motion for Leave to File Excess Pages (Doc. # 32) is **granted**, and Plaintiff's Motion for Leave to File Excess Pages (Doc. # 53) is **granted**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Angela McNutt, filed the instant case on March 10, 2020 against her former employer, Defendant Ross Education, LLC ("Ross"), asserting (I) a sex discrimination claim under Title VII, (II) a sex discrimination claim under Ky. Rev. Stat. § 344.040, (III) a retaliation claim under 29 U.S.C. § 784, (IV) a disability discrimination

claim under 42 U.S.C. § 12111 *et seq.*, (V) a disability discrimination claim under Ky. Rev. Stat. § 344.040, (VI) an FMLA retaliation claim under 29 U.S.C. § 2611 *et seq.*, and (VII) a breach of public policy claim.  (Doc. # 1).  Thereafter, McNutt withdrew her personal disability discrimination claim (Counts IV and V) and her claim for breach of public policy (Count VII).  (Doc. # 54 at 1).  McNutt requests compensatory and punitive damages, as well as an injunction from this Court requiring Ross to reinstate her employment.  (Doc. # 1 at 16-17).  On January 28, 2022, Ross moved for summary judgment on all of Plaintiff's claims.  (Doc. # 33).  Plaintiff responded on April 6, 2022 (Doc. # 54) and Ross replied on April 29, 2022 (Doc. # 59).  This Motion is now ripe for the Court's review.

Up until Plaintiff's termination, effective May 30, 2019, Plaintiff was working as an Associate Campus Director and previously as an Assistant Campus Director of Education and Classroom Instructor at Ross.  (Doc. # 1 ¶¶ 6, 8, 17).  In Plaintiff's role, she was responsible for student and staff retention.  (Doc. # 33-3).  She was supervised by Regional Vice President Sherry Feltson.  (Doc. # 1 ¶ 11).  Ross is a for-profit college located in Northern Kentucky.  (*Id.* ¶¶ 7, 9).  During her employment, Plaintiff had negative interactions with Shibu Thomas, the Executive Vice President of Marketing and Admissions at Ross.  (*Id.* ¶¶ 11-13, 23, 62).  Two specific scenarios are laid out in Plaintiff's Complaint.  The first occurred on July 8, 2016 when Thomas told Plaintiff to "get [her] ass up from behind [her] desk" and otherwise berated her over the phone.  (*Id.* ¶ 11).  Plaintiff reported this event, ultimately alleging that "Thomas evoked a hostile work environment, and caused psychological abuse."  (Doc. # 54-1 at 5).  Later, in April of 2018 at a company training, Thomas pointed at Plaintiff in front of other coworkers and bragged "I made [Plaintiff] leave her campus crying."  (Doc. # 1 ¶ 23).  Plaintiff alleges that Thomas

2

treated her differently than her male peers because of her gender, explicitly stating in her formal complaint against Thomas that she "believe[d] the tone, condescension, and bullying would not have taken place if I were male." (*Id.* ¶ 12). Plaintiff alleges that at least three other female employees have filed similar complaints against Thomas due to his communication style. (*Id.* ¶¶ 15, 21).

Separate and apart from Plaintiff's complaints regarding Thomas, were Ross's alleged actions concerning a student with a suspected mental disability. (*Id.* ¶ 33). In April of 2019, Leslie Shaffer, an Admissions Representative for Ross, shared with Plaintiff that a student, hereinafter referred to as Student H, wanted to re-enroll in Ross after previously discontinuing classes due to a psychiatric hold. (*Id.*). Student H had expressed to Plaintiff and other staff at Ross that demons were telling her to hurt herself and others. (*Id.*). Both Shaffer and Ross were concerned that Student H was not in a financial or psychological position to re-enroll at Ross. (*Id.* ¶ 35).

Mallery Schulkers, Traveling Director of Admissions, and Shaffer's direct supervisor, was alternatively pushing to re-enroll Student H. (*Id.* ¶¶ 28, 36). Plaintiff recommended that Student H's start date be delayed until Plaintiff could receive mental health assistance, thus enabling Student H to be more successful, and preventing Ross from approving financial aid to a student "with little chance of success or job placement." (*Id.* ¶ 37). Sharon Treumuth, an Executive Vice President at Ross, contacted Plaintiff to inquire why Student H's start date was delayed. (*Id.* ¶ 38). On May 8, 2019, Plaintiff informed Treumuth that Student H had mental health disabilities and required another student orientation to "ensure she received the necessary mental health assistance before starting classes and assuming student loan debt." (*Id.* ¶ 39). Around this same

3

time frame, Plaintiff alleges that Ross began "closely scrutiniz[ing]" her work, which Ross had not done prior to Plaintiff's advocacy of Student H.  (*Id.* ¶ 43).  Ross officials allowed Student H to begin classes on May 10, 2019.  (*Id.* ¶ 42).

Plaintiff also suffers from Rheumatoid Arthritis (RA), which causes swelling and joint pain.  (*Id.* ¶¶ 48-49).  Ross had previously approved FMLA leave for Plaintiff due to her RA.  (*Id.* ¶ 49).  In late May 2019, Plaintiff suffered an RA episode where she took intermittent leave from approximately May 23 to May 28.  (*Id.*).  On May 30, 2019, Ross terminated Plaintiff.  (*Id.* ¶ 52).  Plaintiff's termination occurred two days after she returned from FMLA leave, and less than two weeks after Plaintiff had interceded on Student H's behalf.  (*Id.*).  Plaintiff alleges that her allegations of gender discrimination against Thomas, her advocacy for Student H, and her use of FMLA leave are the real reasons for her firing.  (*Id.* ¶ 61).

Ross, on the other hand, argues that Plaintiff's termination was justified due to ongoing complaints about her communication style.  In support of this argument, Ross provides a number of complaints about Plaintiff from Ross staff members.  (*See generally* Docs. # 33-4, 33-5, 33-6, 33-7, 33-8, 33-9, 33-10, 33-11, 33-12, 33-13, 33-14).  The common complaints about Plaintiff related to her "attitude" and abrasiveness (Docs. # 33-4, 33-7, 33-8, 33-9, 33-11, 33-13), harsh language (Docs. # 33-7, 33-11, 33-12, 33-13), and negative leadership style (Docs. # 33-7, 33-9, 33-11, 33-14).  The timing of these complaints ranged from April 27, 2016 to May 20, 2019.

On the day Plaintiff was terminated, May 30, 2019, Ross completed a termination form, in which Plaintiff's termination was marked as involuntary, for inappropriate conduct, namely due to "several complaints of abusive behavior."  (Doc. # 33-18 at 2).  According

to Ross, the decision to terminate Plaintiff's employment was made by Sherry Feltson, Sharon Treumuth, Vice President of Talent Acquisition and Development, Doreen Kephart, and Chief Financial Officer and Treasurer, Tony Iaquinto.  (Doc. # 33-1 at 10). Alternatively, Plaintiff alleges that the only relevant "supervisors" involved in her termination were Iaquinto and Kephart.  (Doc. # 54 at 8).   The decision to terminate Plaintiff occurred on a conference call where at least Treumuth, Kephart, and Iaquinto were present.  (Docs. #  38 at 156, 40 at 134, and 42 at 125).  However, there seems to be a factual dispute regarding whether Feltson was involved in the decision to terminate Plaintiff's employment.  In Iaquinto's deposition, he recalled that Kephart, Feltson, and Treumuth all had input in deciding to terminate Plaintiff.  (Doc. # 40 at 134).  In Treumuth's deposition, she recalled herself and Feltson both making the decision to terminate Plaintiff.  (Doc. # 38 at 162).  Feltson denies being involved or supporting the decision to terminate Plaintiff.  (Doc. # 45 at 81-84).

## III.   ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment "bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Plant v. Morton Int'l Inc.*, 212 F.3d 929, 934 (6th Cir. 2000)).  In deciding a motion for summary judgment, the

Court must draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Following the Court's review of the record, if a "rational factfinder could not find for the nonmoving party, summary judgment is appropriate."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### 1.    *Sex Discrimination (Title VII and Ky. Rev. Stat. § 344.040)*

First, Defendant argues that Plaintiff's sex discrimination claims fail as a matter of law.  (Doc. # 33-1 at 14).  Plaintiff asserts two separate sex discrimination claims—disparate treatment and a hostile work environment.  The same standards used in assessing claims brought under Title VII for sex discrimination claims are also used for claims brought under the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. § 344.040.  *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000) ("[t]he language of the KCRA generally tracks the language of Title VII and, thus, should be interpreted consonant with federal interpretation.") (internal quotations omitted).  Therefore, Plaintiff's Title VII and KCRA claims will be evaluated in tandem.  Title VII provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.

### a.    **Plaintiff's Disparate Treatment Claim**

A plaintiff can establish a sex discrimination claim by either direct or circumstantial evidence.  *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 238 (6th Cir. 2005).  Direct evidence is that which "requires the conclusion that unlawful discrimination was at

least a motivating factor in the employer's actions." *Id.* (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  Alternatively, circumstantial evidence "does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008).

If no direct evidence is present, Plaintiff must follow the burden-shifting framework established in *McDonnell Douglas* in order to prove her sex discrimination case. *White*, 429 F.3d at 238 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under the familiar *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of sex discrimination. *White*, 429 F.3d at 238.  To establish a prima facie case, a plaintiff must show: (1) she is a member of a protected class, (2) an adverse employment action, (3) she was qualified for the position, and (4) she was treated differently than a similarly situated individual outside the protected class. *Vickers v. Fairfield Med. Center*, 453 F.3d 757, 762 (6th Cir. 2006).  The burden then shifts to the defendant-employer to provide a "legitimate, nondiscriminatory explanation for its actions." *Shazor v. Professional Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  Once the defendant provides such a legitimate reason, the burden reverts to the plaintiff to show that the employer's explanation is pretext for discrimination.  *Id.*  In the context of a sex discrimination claim, "to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not disprove, the defendant's proffered rationale." *Id.* (quoting quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012)).

7

The Court will first address Plaintiff's disparate treatment claim which allegedly resulted in her firing.  Here, Defendant argues that Plaintiff has failed to establish a prima facie case in two ways[1]—(1) failing to prove she was qualified for her position, and (2) failing to illustrate that a similarly situated employee was treated more favorably than her. (Doc. # 33-1 at 14).

First, the Court notes that Plaintiff is not yet required to rebut Defendant's proffered legitimate reason for her termination.  Defendant conflates Plaintiff's qualifications for her position with the proposed legitimate reason for her termination—complaints by other Ross employees.  In order to meet this element of her prima facie burden, Plaintiff "need only show that she satisfied an employer's 'objective' qualifications."  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009).  The Sixth Circuit has routinely cautioned lower courts not to consider a defendant's proposed legitimate reason for a plaintiff's termination when evaluating a plaintiff's prima facie case—"[t]o do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003); *see also Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (holding the district court erred when conflating the qualification prong of plaintiff's prima facie case with the employer's proffered reason for termination; "[w]e have repeatedly cautioned district courts against 'consider[ing] the employer's alleged nondiscriminatory reason when analyzing the prima facie case.'").  Defendant has given this Court no other reason to

---

[1]     As noted by Defendant, the other two elements of Plaintiff's prima facie case are clearly established because Plaintiff is a member of a protected class—women, and an adverse employment action was taken against her—termination on May 30, 2019.  (Doc. # 33-1 at 15).

question Plaintiff's qualifications.  Plaintiff has provided the application she filled out for her first position at Ross, as well as a resume demonstrating her qualifications.  (Doc. # 54-8).  Plaintiff has a Masters of Education and worked within the medical education field prior to her employment with Ross.  (*Id.*).  Therefore, the Court finds that Plaintiff has established, for purposes of her prima facie case, that she was qualified for her position at Ross.

Next, Defendant argues that Plaintiff has failed to identify a similarly situated individual who was treated more favorably than Plaintiff.  (Doc. # 33-1 at 16).  Plaintiff identifies Shibu Thomas as a similarly situated party that was not terminated even though he allegedly engaged in conduct similar to what led to Plaintiff's termination.  (Doc. # 54 at 7).  Within the Sixth Circuit, "[a] court's formulation of the similarly situated inquiry should not be exceedingly narrow."  *Lynch v. ITT Ed. Servs., Inc.*, 571 F. App'x 440, 444 (6th Cir. 2014).  A plaintiff is not required to show "an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'"  *Ercegovich*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).  The Sixth Circuit has explained that the similarly situated inquiry should focus on "mak[ing] an individualized determination of which factors are relevant based on the factual context of the case."  *Lynch*, 571 F. App'x at 444.

In situations resulting in disciplinary action, "[f]actors to consider include whether the individuals 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances

9

that would distinguish their conduct or the employer's treatment of them for it." *Arnold v. City of Columbus*, 515 F. App'x 524, 532 (6th Cir. 2013) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  According to Defendant, Plaintiff's termination was due to a number of complaints made by other employees against Plaintiff.  Given this factual context, the Court finds extremely relevant that Thomas also had a number of complaints lodged against him by other employees of Ross, including Plaintiff.  For example, Plaintiff herself made a complaint regarding Thomas's treatment of her, specifically reporting to Tony Iaquinto that Thomas had "berat[ed] her" over the phone on Friday, July 8th, 2016.  (Doc. # 54-1 at 4).  Plaintiff reported that during their conversation, Thomas relayed to Plaintiff that he "did not understand how [Plaintiff] could not take care of [her] campus" and further spoke to her in a condescending tone.  (*Id.*).  Following the incident, Plaintiff indicated that she was shaking and crying.  (*Id.*).  Plaintiff also reported the event to Sherry Feltson, explaining that Plaintiff "felt battered and bullied."  (*Id.*).  At the end of Plaintiff's report, she concluded that "Mr. Thomas evoked a hostile work environment, and caused psychological abuse.  [She] believe[d] the tone, condescension, and bullying would not have taken place if I were male."  (*Id.*).  Later, in April of 2018, Plaintiff had another altercation with Thomas.  According to Plaintiff's Complaint, at a conference with other Ross employees, Thomas pointed at Plaintiff and "bragged, 'I made her leave campus crying.'"  (Doc. # 1 ¶ 23).

A number of other Ross employees also lodged complaints against Thomas and his communication style, specifically towards women.  In April of 2016, Sherry Feltson complained to Iaquinto about Thomas's behavior.  (Doc. # 54-3).  Feltson reported that Thomas "pretty much exploded on her," used "profane language," and communicated in

a way that was "inappropriate, condescending, belittling and obnoxious."  (*Id.* at 1-2).

Feltson explained that Thomas's actions left her "feeling embarrassed, ashamed and

humiliated."  (*Id.* at 1).  In Feltson's report, she also observed that Thomas spoke to a

male staff member, Nicholas Palmer, and "was very gentle."  (*Id.* at 3).  Feltson observed

that Thomas "has an issue with females," and she has "heard of several complaints

regarding his behavior from many females including his direct reports . . . ." (*Id.*).  Kelly

Graft, a Regional Vice President of Ross, complained in June 2017 that the way Thomas

"communicates with [her] . . . is progressively getting worse."  (Doc. # 54-2 at 1).  Graft

reported to Iaquinto that Thomas was contributing to a "very uncomfortable work

environment" by his "disrespectful form of communication," which included "disrespect[]"

and "condescen[sion]."  (*Id.*).  Instead of being terminated, Thomas was required to

complete an online training course, which he was informed of by Iaquinto.  (Doc. # 54-5).

The similarities between the complaints about Plaintiff and Thomas are significant.

Both received numerous complaints about their communication styles and treatment of

other employees.  Both were reprimanded by Tony Iaquinto.  As far as disciplinary action

is concerned, Plaintiff was terminated whereas Thomas was reprimanded and asked to

complete a training.  This Court finds that based on the face of the complaints asserted

against Plaintiff and Thomas, both "engaged in acts of comparable seriousness."  *Bobo*

*v. United States Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

On the other hand, Plaintiff and Thomas are not at the same level in the corporate

structure of Ross.  When Plaintiff was terminated, she was an Associate Campus

Director.  (Doc. # 1 ¶ 17).  At the time of Plaintiff's termination, Thomas was employed as

the Executive Vice President of Marketing and Admissions.  (*Id.* ¶ 11).  However, this

issue alone is not dispositive.  In *Ercegovich*, the Sixth Circuit explained that a plaintiff is not required to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated.'"  154 F.3d at 352.  Instead, the focus is on "relevant aspects."  *Id.*  The most relevant aspect involved in this case is the actions taken by Plaintiff and Thomas which ultimately led to their termination and discipline, respectively.  The Court does not find relevant their different positions, nor the fact that Thomas had an employment contract, because Defendant has alleged that Plaintiff's *conduct* was the sole factor motivating her termination.

Even if the Court were to take into account the difference between Plaintiff's and Thomas's position, it appears that they are subject to the same standards.  The Ross employee handbook specifically lays out that "unlawful harassment" may result in termination.  (Doc. # 54-13 at 15-16).  Likewise, Thomas's employment agreement allows Ross to terminate him with or without cause or for good reason.  (Doc. # 33-21 at 3-6).  Therefore, Thomas's employment agreement does not provide him with any further protection than Plaintiff as an at-will employee.  Another relevant factor could potentially be the supervisors involved in the disciplinary actions leveled against Plaintiff and Thomas.  *Ercegovich*,154 F.3d at 352; *Cf. Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003) ("the 'same supervisor' criterium has never been read as an inflexible requirement.").  Interestingly, here, the same person who disciplined Thomas for his actions, Iaquinto, also took part in Ross's decision to terminate Plaintiff.  (*See* Doc. # 40 at 59-62 and 133-134).  This factor weighs in favor of finding Thomas to be a suitable comparator for Plaintiff's disparate treatment case.

At its core, this case has been framed by Defendant as an employee discipline case.  Defendant has argued that Plaintiff's communication style was the reason for her termination, while simultaneously alleging that complaints about Thomas were irrelevant because of the difference between Thomas's and Plaintiff's positions at Ross.  As made clear by the Sixth Circuit, plaintiffs are "not required to demonstrate an exact correlation between [themselves] and others similarly situated; rather, [plaintiffs] had to show only that [they] and [their] proposed comparators were similar in all relevant respects, and that [they] and [their] proposed comparators engaged in acts of comparable seriousness." *Bobo*, 665 F.3d at 751.  Plaintiff has done that here.

Now that Plaintiff has established her prima facie case of discrimination, the burden shifts to Defendant to provide a "legitimate, nondiscriminatory explanation for its actions." *Shazor*, 744 F.3d at 957 (quoting *Chen*, 580 F.3d at 400).  Defendant contends that Plaintiff was terminated due to "repeated complaints and her failure to meet the interpersonal requirements of her position."  (Doc. # 33-1 at 20).  Defendant has supported this explanation by providing a number of complaints that were filed against Plaintiff during her tenure at Ross.  (*See* Docs. # 33-4 through 14).  Because Defendant's burden is "merely a burden of production, not of persuasion . . . it does not involve a credibility assessment."  *Upshaw*, 576 F.3d at 585.  For this reason, Defendant's purported legitimate, nondiscriminatory reason for Plaintiff's firing—repeated complaints and her failure to meet interpersonal requirements of her position—satisfies its burden of production.

Plaintiff now must demonstrate that Defendant's proffered legitimate reason for her termination was pretextual.  Pretext can be shown through proving the explanation "(1)

had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *Upshaw*, 576 F.3d at 586. The plaintiff must prove the proffered reason was pretext by a preponderance of the evidence. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607 (6th Cir. 2019). "Regardless of which rebuttal method a plaintiff uses, '[s]he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against [her.]'" *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 844 (6th Cir. 2015) (quoting *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)).

To avoid summary judgment on the first basis, Plaintiff should demonstrate that Defendant's reason for her termination "never occurred or were factually false." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 81 (6th Cir. 2020) (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002)). Plaintiff "dispute[s]" the complaints relied upon by Defendant and notes that if relied upon, the complaints "consist of the same kind of conduct for which Thomas was criticized." (Doc. # 54 at 9). However, Plaintiff does not go so far as to say that the complaints "never occurred or were factually false." *Brown*, 814 F. App'x at 81 (citing *Peters*, 285 F.3d at 470). Instead, Plaintiff believes that the complaints were pretextual, in that they did not actually impact the decision to terminate Plaintiff or were insignificant to justify her termination. This type of argument belongs as the basis for the second or third pretext inquiry.

To succeed on the second basis, that the employer's explanation did not actually motivate the challenged conduct, Plaintiff must point to evidence "which tends to prove that an illegal motivation was *more* likely than that offered by the defendant." *Brown*, 814

F. App'x at 82 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). Here, because Plaintiff is asserting a sex discrimination claim against Ross, she needs to show that it is more likely than not that she was fired because of her gender. Plaintiff attempts to do this by showing that Thomas received favorable treatment "for substantially identical conduct." (Doc. # 54 at 23). However, this argument is more appropriately evaluated under the third pretext inquiry, as explained below.

Under the third basis, Plaintiff may show a dispute of fact as to pretext if the defendant's offered explanation is insufficient to justify Plaintiff's termination. *Upshaw*, 576 F.3d at 586. A showing of this nature is typically made by offering evidence that "other employees, particularly employees not in the protected class, were not fired even though they engaged in conduct substantially identical to that which the employer contends motivated its discharge of the plaintiff." *Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 829-30 (6th Cir. 2002) (alteration omitted) (quoting *Manzer*, 29 F.3d at 1084). As discussed in detail above, Thomas is an appropriate comparator to Plaintiff. Thomas was the subject of complaints from Plaintiff, Feltson, and Graft, who all reported Thomas's propensity to speak condescendingly or in an inappropriate manner to women. There is no factual dispute regarding whether Thomas was fired for this behavior, he clearly was not. However, based on the evidence provided by Plaintiff at this stage in the litigation, it appears that the conduct Defendant accused Plaintiff of and the conduct Plaintiff accuses Thomas of is "substantially identical." *Smith*, 36 F. App'x at 829-30 (quoting *Manzer*, 29 F.3d at 1084).

Therefore, the question is whether a reasonable juror considering that evidence could conclude that Plaintiff's sex motivated her termination.   Because Plaintiff has provided evidence that Thomas, who is not a member of the protected class, engaged in substantially similar conduct and was not terminated, she has met her burden at this stage in the litigation.   This type of inferential evidence has long been held to be enough to satisfy the *McDonnell Douglas* burden shifting framework.   *Clark v. Johnson & Higgins*, 181 F.3d 100, 1999 WL 357804, at *8 (6th Cir. May 28, 1999) (table decision) ("the primary benefit of the *McDonnell Douglas/Burdine* burden-shifting framework is that it affords Title VII plaintiffs the opportunity to establish their claims through *inferential* evidence of discrimination.").   As there is a genuine issue of material fact regarding whether Plaintiff's termination for these complaints was pretextual, Plaintiff's sex discrimination claims relating to disparate treatment survive summary judgment.

### b.      Plaintiff's Hostile Work Environment Claim

While Plaintiff's disparate treatment claim survives summary judgment, her hostile work environment claim does not.   In order to succeed on a hostile work environment claim, a plaintiff must prove (1) she was a member of a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the alleged sexual harassment created a hostile work environment; and (5) the employer is liable.  *Smith v. Rock-Ten Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).  In these types of cases, a plaintiff can "establish the inference of discrimination based on sex in three ways," two of which are relevant here: (1) "where the harasser is motivated by general hostility to the presence of [women] in the work place" or (2) "where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both

sexes in a mixed-sex workplace.'"  *Id.* at 307-08.  (quoting *Vickers*, 453 F.3d at 765).

Here, Plaintiff "compare[s] the treatment of her and other women to what she observed to be Thomas' treatment of male employees."  (Doc. # 54 at 35).  Plaintiff again points to the conference in April of 2018.  There, Thomas allegedly pointed at her in front of coworkers and bragged about making her leave campus crying.  (*Id.*); (*see also* Doc. # 1 ¶ 23).  In comparison, Plaintiff alleges that Thomas chatted with male directors and patted them on the back.  (*Id.*).  Similarly, Plaintiff also points to an exhibit where Iaquinto recapped his conversation with Thomas regarding his treatment of female employees.  (Doc. # 54-5).  Iaquinto specifically stated: "[Iaquinto] cautioned [Thomas] on the risk of appearing to treat males differently than females, especially since the complain[]ants are all female, and one of them gave an example of a male who was talked to respectfully and kindly about a similarly emotionally charged issue."  (*Id.* at 2).

When a plaintiff offers comparative evidence regarding how an individual treats men as opposed to women in the workplace, a plaintiff is required to prove that the workplace environment was hostile.  *Rock-Tenn*, 813 F.3d at 309.  "This is so when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Whether the harassment is severe and pervasive is "quintessentially a question of fact."  *Id.* at 310 (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).  Relevant factors include the frequency of the conduct, its severity, "whether it's physically threatening or humiliating, or a mere offensive utterance," and whether "it unreasonably interferes with an employee's work performance."  *Harris*, 510

17

U.S. at 23.

What dooms Plaintiff's hostile work environment claim is the frequency with which she alleges commentary from Thomas occurred and her dependence on harassment suffered by other Ross employees, which she did not learn about until after her termination.  In *Burnett v. Tyco Corp.*, the Sixth Circuit held that "three alleged instances" of conduct against the plaintiff "spread out at the beginning and at the end of a six-month period are not commonplace, ongoing, or continuing, and therefore are less pervasive" than required to show a hostile work environment claim.  203 F.3d 980, 984 (6th Cir. 2000).  Plaintiff only alleges two incidents where Thomas humiliated her, which were separated by almost two years.  (Doc. # 1 ¶¶ 11, 23).  This is not the kind of pervasive conduct contemplated by Title VII.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.").  Similarly, in *Abeita v. TransAmerica Mailings, Inc.*, the Sixth Circuit explained that harassment of other employees is "irrelevant" if "there is no evidence that plaintiff was aware of these actions at the time."  159 F.3d 246, 249 n.4 (6th Cir. 1998).  This is because "comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile."  *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009).  In Plaintiff's deposition, she indicated that she learned of certain complaints against Thomas after she was terminated.  (Doc. # 50 at 133, 135).  Likewise, Plaintiff's Complaint does not make clear when she became aware of other employees' complaints about Thomas, instead she simply alleges that she "is aware that at least three female employees have filed complaints against Mr. Thomas . . ."  For these reasons, summary judgment in favor of

Defendant is granted on Plaintiff's hostile work environment claim.

### 2.   *Plaintiff's Retaliation Claims*

Plaintiff also alleges a retaliation claim against Defendant based on three separate theories—that she was retaliated against due to (1) her complaints of sex discrimination, (2) her support of the rights of a student with a mental health disability, or (3) her use of FMLA leave.  (Doc. # 1 ¶¶ 61, 64, 70, 88, 99).  The sex discrimination allegedly suffered by Plaintiff was discussed in detail above, *supra* Section III.A.1.a, but the factual circumstances regarding the other two scenarios have not yet been addressed in detail.

### a.   Sex Discrimination Retaliation Claim

First, the Court will turn to Plaintiff's claim that she was retaliated against due to her complaints regarding discrimination on the basis of sex at the hands of Thomas.  To prove a retaliation claim under Title VII, Plaintiff must show that: "(1) she engaged in an activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment*."  *Morris*, 201 F.3d at 793.  The first three elements are clearly met—(1) Plaintiff engaged in a protected activity by complaining to Ross regarding Thomas's treatment of her, (2) Ross was aware of Plaintiff's complaint, (3) Plaintiff was later terminated.  However, Plaintiff has failed to show any causal connection between the protected activity and her termination in either her Complaint or her Response to Defendant's Motion for Summary Judgment, or even address the elements of a sex discrimination retaliation claim.  Plaintiff similarly does not point to any facts to

create a causal connection between her complaints regarding Thomas and her ultimate termination.  Because of this, Plaintiff has waived her sex discrimination retaliation claim. *See Vickers*, 453 F.3d at 761 n.1 (noting that where a plaintiff "fails to make any argument regarding his Title VII retaliation claim" besides asserting the claim, the "claim[] [is] waived.").

### b.      Section 504 Retaliation Claim

Next, the Court turns to Plaintiff's retaliation claim regarding her advocacy for Student H.  Under Section 504 of the Rehabilitation Act, "no person may discharge, intimidate, retaliate, threaten, coerce, or otherwise discriminate against any person," 29 C.F.R. § 33.13, for actions "seeking to enforce rights under" the ADA or Section 504.  *A.C. ex rel. v. Shelby Cnty. Bd. of Ed.*, 711 F.3d 687, 696-97 (6th Cir. 2013).  The KCRA is interpreted in the same manner as Section 504.  *Kirilenko-Ison v. Bd. of Ed. of Danville Independent Schs.*, 974 F.3d 652, 661 (6th Cir. 2020).

A Section 504 retaliation claim can be proven by direct or circumstantial evidence of retaliation.  *A.C. ex rel.*, at 697.  If Plaintiff relies on indirect evidence, the *McDonnell Douglas* burden shifting analysis is used.  *Id.*  Here, however, Plaintiff argues that both direct and circumstantial evidence exists to support her retaliation claim.  (Doc. # 54 at 37).  "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016).  As explained in *Ferrari v. Ford Motor Co.*, "when an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision . . . [t]he *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell*

20

*Douglas* was designed, has been admitted by the defendant . . . and the plaintiff has direct evidence of discrimination on the basis of his or her disability."  826 F.3d 885, 892 (6th Cir. 2016) (internal quotation marks omitted) (*abrogated on other grounds by Lewis v. Humboldt Acquis. Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc)).

Plaintiff argues that Defendant has affirmatively acknowledged to the Court that the "tipping point" that ultimately led to Plaintiff's termination was a complaint by Leslie Shaffer.  (Doc. # 54 at 37-38); *see also* (Doc. # 33-1 at 7-8); (Doc. # 40 at 149).  Shaffer's written complaint, dated May 16, 2019, explicitly references Student H and Plaintiff's opinion that she "was not mentally capable or prepared" and Plaintiff's unwillingness to set up an orientation for this student.  (Doc. # 33-14 at 2).  Plaintiff also points to an email thread where she contacted the Director of Admissions explaining that Student H needed to attend orientation before re-enrolling at Ross, partly due to Student H telling Plaintiff "she has demons in her head telling her to hurt people."  (Doc. # 54-16 at 4).  Multiple Ross officials were looped into this email chain at various points in time, including Thomas, Treumuth, and Feltson.  (*Id.* at 1-5).  While these facts certainly support Plaintiff's retaliation claim, the Court finds that this is not "direct evidence" of retaliation because Ross never admitted its' intent in firing Plaintiff was due to her advocacy of Student H.  Shaffer's written complaint, while it discusses Student H, is largely based on Plaintiff's alleged mistreatment of Shaffer.  For example, Shaffer's complaint revolves around Plaintiff's communication style, or lack thereof, and Plaintiff's "constant[] talking behind [Shaffer's] back," which Shaffer alleged was creating a very negative work environment for her.  (Doc. # 33-14 at 3-4).  As this evidence "would require the finder of fact to draw inferences in order to reach the conclusion that unlawful retaliation was at

least a motivating factor in [Plaintiff's termination], it does not constitute direct evidence of retaliation." *Kirilenko-Ison*, 974 F.3d at 638. Therefore, in the absence of direct evidence of discrimination, Plaintiff is required to meet "her easy burden at the prima facie stage" under the *McDonnell Douglas* framework. *Id.* at 661.

The Court finds Plaintiff has met this burden. To do so, Plaintiff must show that she: (1) "engaged in activity protected under Section 504 and the ADA; (2) [Defendant] knew of the protected activity; (3) [Defendant] then took adverse action against [p]laintiff[]; (4) there was a causal connection between the protected activity and the adverse action." *A.C. ex rel.*, 711 F.3d at 697. First, advocating on behalf of disabled students is protected under Section 504. *Kirilenko-Ison*, 974 F.3d at 662. Plaintiff argues that she advocated for Student H's start date be delayed until Student H could receive mental health assistance, thus enabling Student H to be more successful, and preventing Ross from approving financial aid to a student "with little chance of success or job placement." (*Id.* ¶ 37). Ross argues that Plaintiff was not advocating on behalf of a student with a disability because Plaintiff can point to no direct knowledge or medical records showing that Student H had a mental disability. (Doc. # 33-1 at 23-24).

Defendant is correct that at some point, Plaintiff would be required to prove that Student H was disabled to succeed under her Section 504 claim. *See generally Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). However, at the summary judgment stage, all Plaintiff must do is "at least raise[] a question of fact as to whether she engaged in protected activity." *Hicks v. Benton Cnty. Bd. of Ed.*, 222 F.Supp.3d 613, 639 (W.D. Tenn. 2016). Plaintiff has explained that she believed Student H was disabled because of her own observations and interactions with Student H. For

example, Plaintiff had a meeting with Student H, outlined in the previously mentioned email thread.  According to Plaintiff, in that meeting, Student H stated "she ha[d] demons in her head telling her to hurt people" and Plaintiff "want[ed] to be sure everyone [was] safe."  (Doc. # 54-16).  The disability element of the prima facie case is a necessary one because unless it was believed that Student H was disabled, "it would be impossible for [Defendant] to have made its decision" to fire Plaintiff based on her advocacy of Student H.  *Burns v. City of Columbus*, *Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996).  A "[disabled] person"[2] is defined under Section 504 regulations as "any person who (i) has a physical or mental impairment which substantially limits on or more major life activities, (ii) has a record of such impairment, or (iii) *is regarded as having such an impairment*."  34 C.F.R. § 104.3(j) (emphasis added).  While there is no binding precedent within the Sixth Circuit regarding a *perceived* disability, this Court is persuaded that if a plaintiff has a reasonable basis for suspecting that an individual is disabled, and illustrates that basis, she has met her burden at the summary judgment stage.  *See Garber v. Embry-Riddle Aeronautical Univ.*, 259 F. Supp. 2d 979, 983 (D. Ariz. 2003) (holding that a plaintiff may survive summary judgment when he had "a reasonable basis" to conclude an individual was disabled and then advocated for that student).

Defendant clearly was aware of Plaintiff's advocacy for Student H, as discussed in detail in the previously mentioned email chain, which included on the distribution list people intimately involved in Plaintiff's termination.  (Doc. # 54-16).  As for a causal

---

[2]     The original definition is for the term "handicapped person," which is an outdated term that some people with disabilities may find "objectionable," as courts have noted.  *See, e.g.*, *Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 250 F. Supp. 2d 706, 708 n.1 (W.D. Ky. 2003).  The Sixth Circuit has otherwise recognized that the terms "disabled" and "handicapped" are generally interchangeable.  *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 537 n.1 (6th Cir. 2014).

connection between Plaintiff's termination and her advocacy for Student H, Plaintiff's supervisor, Feltson, stated that following Plaintiff's advocacy for Student H, "all hell broke loose for [Plaintiff]." (Doc. # 45 at 171). In addition, the Shaffer Complaint, relied upon Defendant as a purported reason for Plaintiff's firing, explicitly acknowledges Plaintiff's advocacy of Student H. (Doc. # 33-14). Plaintiff's termination also occurred only three weeks after Shaffer's Complaint referencing Plaintiff's advocacy of Student H. Temporal proximity between Plaintiff's termination and her protected activity can alone establish causation "in some circumstances." *Kirilenko-Ison*, 974 F.3d at 664. "[A]n inference of causation may arise solely from the closeness in time between the point at which an employer learns of an employee's protected activity and the point at which it takes an adverse action against that employee." *Id.* Here, where there is less than a month between the activity and termination, the inference arises that Plaintiff may have been terminated due to her advocacy of Student H. Taking each of these factual details into account, a reasonable juror could find that the causation element of Plaintiff's Section 504 claim has been met. Defendant's argument rests entirely on the premise that Plaintiff cannot illustrate a prima facie case necessary to succeed on her Section 504 claim. But, as discussed here, Plaintiff has met that "easy" burden at this stage in the case. In return, Defendant has failed to show the absence of a genuine dispute of material fact.[3]

Defendant still maintains that Plaintiff must show that her advocacy for Student H was the sole reason for her firing in order to succeed. (Doc. # 33-1 at 22-25). Section

---

[3] Defendant also argues that Plaintiff was required to exhaust administrative remedies prior to bringing her Section 504 claim. (Doc. # 33-1 at 23). Unfortunately for Defendant, as pointed out by Plaintiff, administrative exhaustion is not required. *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 470-71 (6th Cir. 1993) ("exhaustion is not a prerequisite to private enforcement of section 504").

504 has been read to require an individual with a disability to prove they were fired "*solely by reason of her or his disability.*"   29 U.S.C. § 794 (emphasis added).   This "sole" language has been extended to those advocating on behalf of those with a disability.   *See Caldwell v. Bartlett City Schs.*, No. 2:16-cv-2608, 2017 WL 8819282, at *10 (W.D. Tenn. Oct. 17, 2017).   However, the circumstantial evidence provided by Plaintiff as discussed previously at least creates an inference that Plaintiff was fired because of her advocacy of a student with a disability.   That Plaintiff was fired solely on the basis of her advocacy for Student H may be proven by a "set of facts consistent with those allegations in the complaint that would sustain a recovery."   *Menkowitz v. Pottstown Mem. Med. Ctr.*, 154 F.3d 113, 125 (3d Cir. 1998).   For this reason, Plaintiff's Section 504 claim may proceed, but Plaintiff is cautioned that succeeding on her sex discrimination claim would necessitate the failure of her Section 504 claim.

### c.    FMLA Retaliation Claim

Lastly, the Court turns to Plaintiff's FMLA claim.   In 2017, Ross granted Plaintiff's intermittent FMLA leave request "due to a progressive disease which causes debilitating pain and fatigue"—her rheumatoid arthritis ("RA").   (Doc. # 54-17).   Shortly before her termination, Plaintiff took two days of FMLA leave on May 23 and 24 of 2019.   (Doc. # 54-19).   Plaintiff was then terminated on May 30, 2019.   (Doc. # 1 ¶ 52).   Plaintiff's FMLA retaliation claim is again tested by the *McDonnell Douglas* burden shifting framework.   *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).   Defendant focuses on the causal element of Plaintiff's prima facie burden.   (Doc. # 33-1 at 27).   Defendant argues that in order to establish the causal connection between Plaintiff's use of FMLA leave and her firing she "must show some type of retaliatory intent."   (*Id.*) (citing *Tennial v. United*

*Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016)).  In *Tennial*, the Sixth Circuit found that where a plaintiff was demoted after taking FMLA leave, six months between plaintiff's return from leave and his demotion was "too long to support such a[] [retaliatory] inference."  *Id.* at 309.  *Tennial* is not a helpful comparison to this case because Plaintiff was fired days after taking FMLA leave.  Within the Sixth Circuit, it is undisputed that temporal proximity between use of FMLA leave and an adverse employment action "is deemed indirect evidence such as to permit an inference of retaliation to arise."  *Seeger v. Cincinnati Bell Tele. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)).  As fully explained in *Mickey v. Zeidler Tool and Die Co.*:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purpose of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.  The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation.

516 F.3d 516, 525 (6th Cir. 2008) (internal citations omitted).  However, "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unusually suggestive."  *Id.* (collecting cases) (quoting *Cardenas v. Massey*, 269 F.3d 251, 264 (3d Cir. 2001)).  Here, while Plaintiff was only fired days after taking two days of intermittent FMLA leave, her FMLA leave was approved by Defendant in June of 2017, almost two years prior to her termination.  (Doc. # 54-17).  As discussed in detail throughout this opinion, there were various factual circumstances

surrounding Plaintiff's firing, and both Plaintiff and Defendant have put forth a multitude of reasons as to why Plaintiff was terminated.  This is not a case where "little other than the protected activity could motivate the retaliation."  *Mickey*, 516 F.3d at 525.  This is especially true when taking into consideration the fact that Plaintiff's FMLA leave was approved, and used, many times throughout her tenure at Ross.  (Doc. # 50 at 248-250).  Plaintiff acknowledged that she never had any issue when submitting and taking FMLA leave in the past.  (*Id.* at 251-252).  Because of these facts, the Court finds that the temporal proximity in this case is not "unusually suggestive," and Plaintiff failed to show retaliatory intent following her use of FMLA leave.   Therefore, summary judgment is granted in favor of Defendant on Plaintiff's FMLA retaliation claim.

## IV.    CONCLUSION

For the reasons articulated herein, **IT IS HEREBY ORDERED** as follows:

(1)    Defendant's Motion to File Excess Pages (Doc. # 32) is **GRANTED**;

(2)    Plaintiff's Motion to File Excess Pages (Doc. # 53) is **GRANTED**;

(3)    Defendant's Motion for Summary Judgment (Doc. # 33) is **GRANTED in part and DENIED in part**, as follows:

(a)    Plaintiff's disparate treatment claim, brought under Title VII and the Kentucky Civil Rights Act, and Plaintiff's Section 504 claim may proceed;

(b)    Plaintiff's remaining claims are all dismissed, including Plaintiff's hostile work environment claim, Plaintiff's sex discrimination retaliation claim, and Plaintiff's FMLA retaliation claim; and

(4)    **Not later than September 15, 2022**, the parties shall file a **Joint Notice** of available dates for a final pretrial conference and trial, and whether they would be

amenable to a court facilitated settlement conference on the remaining claims.

       This 24th day of August, 2022.



**Signed By:**

_**David L. Bunning**_

**United States District Judge**

M:\DATA\ORDERS\Cov2020\20-34 MOO.docx